Ronald L. TODD and Michael Cochran, et al., Plaintiffs,

v.

JOINT APPRENTICESHIP COMMITTEE OF the STEEL WORKERS OF CHICAGO and International Association of Bridge, Structural and Ornamental Iron Workers Local Union No. 1, et al., Defendants.

No. 63 C 1739.

United States District Court
N. D. Illinois, E. D.

Oct. 16, 1963.

William R. Ming, Jr., Harold McDermid, Chicago, Ill., for plaintiffs.

James P. O'Brien, U. S. Atty., by John P. Lulinski and John J. Crowley, Chicago, Ill., for defendant Dominic Tesauro.

John J. Faissler and Bernard J. Nussbaum, Chicago, Ill., for defendant Paschen Contractors, Inc.

Paul R. Conaghan, Chicago, Ill., and G. W. Thursby, for defendant Bethlehem Steel Co.

Bernard M. Mamet and Sinclair Kossoff, Chicago, Ill., for defendant Local No. 1.

Jerome A. Frazel, Jr., Robert Kelling, Chicago, Ill., for defendant Joint Apprenticeship Committee.

John T. Mehigan, Thomas R. Tyrrell, Chicago, Ill., for Board of Education.

CAMPBELL, Chief Judge.

The instant action, which might best be described as a suit alleging the discriminatory denial of job opportunities in violation of the United States Constitution, was first presented on a motion for a temporary restraining order or in the alternative for a preliminary injunction.

By way of chronology I should here record that prior to accepting the task of deciding this case on its merits I attempted, unsuccessfully, in a pre-trial conference to have the attorneys for the respective parties reach an amicable settlement.

When settlement showed itself to be impossible, I immediately heard oral argument on the all important issue of jurisdiction. The excellent oral arguments of all counsel, buttressed by their equally fine supporting briefs, convinced me, first, of the unusual importance and significance of this case from both a legal and a sociological perspective; second, of an apparent conflict between the equities of the case and what law there is relative to the issues; and thirdly, of the fact that for the most part this complaint, taken as a whole, presented a case of first impression, which should proceed at this time without further delay to do justice to all parties concerned.

In order better to study the issues, I required the additional benefit of knowledge of the facts underlying the complaint, facts which it was apparent defendants' counsel themselves did not agree upon in their oral arguments on the jurisdictional issue. I, therefore, denied the motions to dismiss without prejudice to their being renewed at the close of the evidence on the motion for a preliminary injunction.

I thereby reserved the jurisdictional issue with the factual issue until now.

After receiving evidence on the facts involved, hearing the most eloquent arguments of all counsel, and re-reading the excellent briefs previously submitted I now make the following findings of fact and conclusions of law.

The named plaintiffs, three young negroes, bring this case as a class action on behalf of themselves and all other

negroes who are similarly situated. The defendants are identified as follows:

1. Joint Apprenticeship Committee of the Steel Workers of Chicago and International Association of Bridge, Structural and Ornamental Iron Workers Local Union No. 1, and Its Named Officers and Officials named in the complaint, which will be hereinafter referred to as the Joint Committee, or as the Committee.

2. Iron Workers Bridge and Structural Union, Local No. 1, and Its Officers and Officials named in the complaint, which entity will hereinafter be referred to as the Union.

3. Paschen Contractors, Inc., a Delaware Corporation, and Peter Kiewit Sons Co., a Nebraska Corp., which will be hereinafter referred to jointly as The Contractor.

4. Bethlehem Steel Company, a Delaware corporation, which will hereinafter be referred to as Bethlehem.

5. Dominic Tesauro, Regional Administrator, General Services Administration, who will hereinafter be referred to either as Tesauro or the G.S.A.

6. Alvin A. Dost, Regional Director, Bureau of Apprenticeship and Training, U. S. Department of Labor, which hereinafter will be referred to as Dost or the Bureau.

7. Board of Education, City of Chicago, which will hereinafter be referred to as the Board of Education.

There is little dispute as to the facts, although there seems to be a grave question as to what findings they may justify. Thus, for present purposes I will merely outline the facts to the extent necessary to permit me to recite my findings thereon.

In October, 1962, GSA entered into a contract for the construction of a United States Courthouse and Office Building structure herein the City of Chicago with the defendant Contractor, who in turn sub-contracted with the defendant Bethlehem as to the steel work. These contracts included provisions which in effect require the Contractor and Sub-Contractor not to discriminate on the basis of race, religion or ethnic background in the hiring of their employees. The contracts also specifically include by reference the terms of Presidential Order No. 10925 on Equal Employment Opportunities.

The defendant Union is the sole supplier of iron workers to Bethlehem on the instant job. Bethlehem by virtue of its collective bargaining contract must hire only those certified to it by the Union.

This Union has never had a negro among its membership. Moreover, the Joint Committee which supplies this Union with its new members through an apprenticeship program has never, until July of 1963, had a negro application on file. The Joint Committee is the sole supplier of apprentices to the Union.

To relieve what on its face appeared to be a patent policy of discrimination an initial attempt was made by government agencies to locate negro journeymen who were Union members. It is noted that this search was not confined to this area, and in fact, this search failed to produce so much as one negro within the ranks of the defendant Union. Having so failed, some six negro welders who had experience working on steel were suggested to the Union and/or to Bethlehem in the hope that some of them might be acceptable journeymen. These men were all found to be incompetent prospective journeymen, either on the basis of their age or lack of experience.

Next, the plaintiffs, the aforesaid three young negroes, after being tested as to aptitude, potential ability and suitability were encouraged by the same government officials to seek employment on this federal job as apprentice iron workers. In the latter part of June, 1963, they were interviewed by representatives of Bethlehem who found two of the three, Todd and Hill, to be qualified. The evidence

brought forth the fact that Bethlehem was and is of the belief that one of the specifically named plaintiffs, Michael Cochran, would not be a satisfactory employee. I need not and will not go into the reasons and merits prompting Bethlehem's position with reference to Cochran beyond concluding, which I do, that Bethlehem's decision that it did not want Cochran was not an act motivated or principled upon reasons of racial discrimination. Bethlehem did, however, express a willingness to hire Todd and Hill as apprentice iron workers subject to their being properly indentured and presented by the Union. This fact was made known by Bethlehem to the Union and to the Joint Committee. All three plaintiffs did, also during the latter part of June, 1963, fill out apprenticeship training applications with the Joint Committee. None of the three were or have been indentured and/or submitted to Bethlehem for employment.

To become a member of the Union through the apprenticeship program an applicant must first be permitted to fill out an application. That application must then be accepted by the Joint Committee, said acceptance coming only after the applicant has been examined by the Committee.

Conflict inheres in the testimony, the documentary evidence and the representations of counsel as to the method by which applicants are selected for indenture certification. Chronology of application is probably a criteria, assuming the Joint Committee desires it to be. But as a practical matter, I find that selection is wholly within the arbitrary discretion of the Joint Committee. In any event, I find that the actual operation of the instant program considered in light of its results discriminates against negroes, more specifically against the rights of negroes to learn and earn a living in, the particular trade involved. I find that whatever apprenticeship list the Joint Committee does have represents a history of discrimination against negroes.

The defendant Contractor has had in its employ on the Federal Courthouse Building some 35 to 40% negro employees. All other unions working on the structure have negroes among their members, and who are actively employed. Contrastingly, the Union here has presently some 2,300 members none of whom are negro. Since 1952, there have been approximately 800 apprenticeships in the instant Joint Committee program, some 400 of which have graduated to become journeymen. None of these 800 were or are negroes. Bethlehem Steel at one time during peak employment, employed 114 journeymen iron workers on this government project and none were negroes.

Based upon rational and reasonable inferences I find that either negroes were refused application blanks by the Joint Committee, or if permitted to file such applications they were never acted upon. I find that the negro community as such knew of this policy of the Joint Committee and the Union and that because of the inherent and patent futility of such action sent few applicants in recent years to the Joint Committee or the Union.

To make my position clear, I should observe that the mere absence of members of the negro race on the roles of this specific Union or on the roles of that Union's apprenticeship list would not in and of itself be proof of discriminatory membership policies.

However, the evidence before me, including but not limited to the history and general policies of the Union and the Joint Committee, manifest a definite policy and history of discrimination against those of the negro race. These facts present a clear picture not of racial segregation but of racial exclusion. The above cited facts and figures evidence a systematic policy on the part of the Union and the Joint Committee to exclude negroes solely on the basis of their race. Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220.

It is obvious from a reading of the GSA correspondence in evidence and from the testimony of Mr. Tesauro that the GSA was not satisfied that the Joint Committee's selection of apprenticeships for indenturing in the past had been

based strictly on a chronological membership list basis. Nor was the GSA satisfied that the Union's membership policy had been non-discriminatory. It is equally obvious that the GSA believed the Joint Committee to have discriminated against negro applicants and to be discriminating against these specific plaintiff negro applicants.

I think it also fair to state that GSA was of the belief that the Union in the past had discriminated against negroes relative to membership. On the basis of the same GSA files and the additional evidence presented to me, I find to be a fact the above suspicions and beliefs of the GSA. I find that the Joint Committee and the Union discriminated against negroes who sought admittance to the said Union.

The Joint Committee's apprenticeship program operates under the approval, certification, and with the continued assistance of the Bureau. The Joint Committee's apprenticeship program is presently registered by the Bureau, although no application list has ever been submitted to the Bureau. The Bureau has never sought to dis-certify the Joint Committee's program, rather, on the other hand, the Bureau has on several occasions sent to the Joint Committee letters of commendation.

A full program of academic instruction is and has for some time been conducted as part of the apprenticeship program. Facilities and equipment of the Board of Education are used for this academic instruction. The three hour classes, which convene two nights per week, are taught by teachers employed and paid for by the Board of Education. Admission to these classes can come only upon approval by the Joint Committee. Of the 56 students presently enrolled, none are negroes.

■ To reduce somewhat the necessary scope of my legal comments I wish here to indicate my own belief in the non-applicability and legal insufficiency of any contractual 3rd party beneficiary theory in relation to the instant action. Suffice it to say, I am of the opinion and legally conclude that the plaintiffs, either singularly or as a class, are not true "donee" or "creditor" beneficiaries, but rather, are at best "incidental" beneficiaries and as such have no contractual rights against any of the defendants. Even assuming for the sake of argument the existence of such rights they would at best be limited against those in privity, which in light of my foregoing factual findings would render such an action worthless. In light of my remarks on this subject during the trial, I doubt that this ruling comes as any great surprise to counsel. Those legal arguments presented by the various defendants, solely addressed to this *ex contractu* theory of recovery, therefore, will not be further discussed.

Now, as to plaintiffs' more general theory, wherein they allege that their rights as a class have been constitutionally violated, I find much merit. Accordingly, I hereby once again deny, and this time on the merits, all pending motions to dismiss the instant complaint for want of jurisdiction and all motions to dismiss for failure to state a claim upon which relief can be granted.

■ I find this action to be properly within the wording of Rule 23, subsection (a) (1), of the Federal Rules of Civil Procedure, as one involving a joint and common right; the right of negroes as a class to claim guarantees afforded them by the 5th and 14th Amendments to the Constitution of the United States. I conclude as a matter of law that the jurisdiction of this Court in the instant action can be and is properly invoked under Title 28 United States Code, Sections 1331, 1343, Sub-section (3), 1346, Subsection (a) (2) and 1361, as well as Title 42, Sections 1981 and 1983.

I shall here briefly consider some of the legal arguments interposed by various defendants and in so doing indicate the reason or reasons why I have not seen fit to adopt them in the present case.

One of the strongest arguments, one which directly challenges my right even to consider this case in the first instant, is that presented by the United States Attorney on behalf of defendants Tesauro

and Dost. The argument contends that this court lacks jurisdiction on the instant complaint inasmuch as the United States Attorney suggests, this action is really against the United States and in effect seeks an injunction against it. I am not unmindful of the fundamental pronouncements relative to the nature and extent of the law of sovereign immunity by the Supreme Court relative to injunction matters against the United States. Larson v. Domestic and Foreign Commerce Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628, in 1949 and more recently in Malone v. Bowdoin, 369 U.S. 643, 647, 82 S.Ct. 980, 8 L.Ed.2d 168.

In the words of the Supreme Court, " * * * the crucial question is whether the relief sought in a suit nominally addressed to the officer is relief against the sovereign". (Larson, page 687, of 337 U.S., page 1460 of 69 S.Ct., 93 L.Ed. 1628). However, the same Supreme Court has far from interpreted its above quoted language in a totally literal sense. Without attempting here to examine its motivations, a study of the Court's decisions relative to this law of sovereign immunity would clearly indicate precedent upon which to rest the present action against both Tesauro, as Regional Administrator of the General Services Administration and Dost, as Regional Director of the Department of Labor's Bureau of Apprenticeship and Training. Although not directly salient to the present action, I cite Vitarelli v. Seaton, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012, wherein the Court ordered the Secretary of the Interior to reinstate a discharged federal employee to his government position; and in Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 the Court apparently acknowledged the existence of jurisdiction in the federal courts over complaints alleging that federal employees violated individual constitutional rights. And in the more recent Malone decision cited above, the most recent pronouncement by the Court on the instant subject, the Court by no means indicated any present desire to totally truncate the possibility of such actions,

for in Malone the Court in essence stated that one can sue a government agency if there is a constitutional violation in the present exercise of the agency's power. I also cite 3 Davis, Administrative Law Section 27.08. Moreover, as I indicated at the time this argument was orally presented to me, I did not then nor do I now intend to enjoin the United States of America.

As to the argument by the Union and the Joint Committee that they cannot be sued as an entity under Illinois Law, I need only cite Rule 17, subsection (b) (1) of the Federal Rules of Civil Procedure which I believe applies to both the Union and the Joint Committee. The Rule permits a suit against such an unincorporated association " * * * in its common name for the purpose of enforcing for or against it a substantive right existing under the Constitution or laws of the United States, * * * ". Moreover, the complaint specifically makes parties those who clearly are the responsible officers of both the Union and the Joint Committee. There is little doubt in my mind but that those necessary to enable me to enter judgment are properly before the court as party defendants.

I find unjustifiable and of little merit the Union's contention that plaintiffs have failed to join an indispensable and necessary party, namely the some 148 men (actually the evidence indicated this figure now to be closer to some 90 men) whose names the Union contends appeared and appear on the apprenticeship list ahead of those of the plaintiffs specifically named in the caption of the complaint. In the first place this contention is based upon what the evidence and my factual findings have proved to be an inaccurate assertion and assumption, namely, that the Joint Committee in fact maintains or maintained a chronological list from which prospective applicants were called in order of their application. (On October 3, in oral argument before the court, counsel for the Joint Committee unequivocally stated that the selection of applicants for actual indenturing involved discretionary selec-

tion based upon several criteria. This statement was borne out by the evidence.) Moreover, even assuming the facts to be contrary to the evidence and my expressed findings, as the Union's counsel suggested them to be, these 148, or however many we may now have, individuals could not be said to have such an interest in this controversy that a complete decision would be unjust and impossible without them as parties. I am of the opinion that this suit is neither directly or indirectly against them; if they feel otherwise I should make it clear that I am not now nor would I in the future have any intention to preclude their joinder in this action.

Parenthetically, I might observe that I would, were the issue properly before me, find little merit to any argument seeking to assert the alleged rights of persons whose names appeared preferentially on lists which were in their entirety the result of a discriminatory practice. Once having come to the point of finding a history of discrimination, as I have done here, it would become imperative upon me sitting in Equity, to somehow off-set the effect of previous discrimination and not to protect its by-product. To this extent, and in this relation at this juncture I should observe that the anecdote of counsel for Bethlehem illustrating the extremes to which an Englishman would go, and apparently with impunity, to protect his queue rights, deserves comment.

Assuming that I could even partially accept the fact that one standing to the rear of a line should not, for fear of death, attempt to advance in the line ahead of others who preceded him, still I would now unanalogize the anecdote by interposing the additional fact, obvious from the evidence in the instant case, that the person standing in the rear of the line is and was there because others would not permit him to advance to the line until it already had been formed.

Apparently as an afterthought, since it was not mentioned at the time the initial motions to dismiss were argued, counsel for the Union in his final argument

insisted that jurisdiction over the instant complaint has been pre-empted by the National Labor Relations Board under Sections 157 and 158, sub-section (b) (2) of Title 29 of the United States Code.

In support of this argument counsel cited cases which he inferred to the court were on point. Not only have I, upon a reading of the cases cited, found them, in my opinion, to be inapposite, but if any thoughts relative to the instant cases are to be distilled therefrom it is that the method herein employed by the plaintiffs is the only one available to them.

Indeed, counsel's legal argument can be dispelled without even referring to the cases, which he cites. Section 157 concerns itself with the rights of employees to form, join and assist labor unions and bargain collectively with their employers. Needless to say, this section is addressed to employers of employees and has no factual relationship to the instant complaint. Section 158 generally concerns itself with unfair labor practices. Sub-section (b) (1) provides:

"(b) It shall be an unfair labor practice for a labor organization or its agents—

"(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title: Provided, That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein; or (B) an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances;"

This sub-section addresses itself only to unfair labor practices by a Union—unfair labor practices against employees. The statute in no way proscribes the discriminatory conduct alleged and proved in this case. For that matter I might gratuitously comment that if, as suggested by the Union's attorney, this action were initiated before the National Labor Relations Board, the same Union and possibly through the same attorney would un-

doubtedly be the first to defend on the ground that the complainants were not employees or members of the Union and as such were entitled to no rights under the Act which it cites here. It is obvious to me that a union's responsibility under this Act does not extend beyond the membership of its own union and the non-union employees who are members of the same bargaining unit. The statute expressly exempts from its provisions, even assuming *arguendo* its applicability to the non-employee plaintiffs in the instant case, the right of a union to determine its membership. It is that which is specifically so exempted from that act which is the issue here.

In this regard I note the language and the holding of the Supreme Court in Brotherhood of Railroad Trainman v. Howard, 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283. The complaint there as here was brought against a union by non-members (but employees) alleged discrimination in the denial of job opportunities. The Court specifically considered and expressly rejected the union's contention that it was protected by the Norris-LaGuardia Act. It is interesting to note that the Court considered and rejected still another argument by the union; that its actions were those of private parties and as such not subject to the constitutional proscriptions. The Court there did have before it what it held to be a statutory duty arising under the provisions of the Railway Labor Act (45 U.S.C. § 151 et seq.) However, in justifying its action in enjoining continued discrimination by the union the Court cited two cases, one of which was Shelley v. Kreamer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161. Notably, there was no such statute in Shelley.

At the onset of these proceedings I was somewhat impressed by statements made by plaintiffs' counsel in answer to the defendants' respective motions to dismiss. If plaintiffs' counsel will permit me the right to somewhat paraphrase, and I might add shorten, his comments, they were that taken as a whole the arguments of defendants' counsel seemed to "add up to" and agree that: the plaintiffs had some legal rights which were violated; that whatever these rights are they have something to do with the Government of the United States; however, the courts of the United States are the wrong place to bring an action seeking to redress the deprivation of these rights; and in any event, the wording of the present complaint shows it to be an improper vehicle upon which to proceed.

■ One of the defendants' counsel in his closing argument summarized the action as being, "A good cause in a bad case." The above reasoning is not completely without legal support. However, I find justification in the basic and fundamental axiom of equity *"Ubi Jus Ibi Remedium"*—where there is a right there should be a remedy.

Fortunately we have come a long way since Judge Ferguson found little merit to a demurrer filed to a criminal information by a defendant named Plessy who was convicted of violating a Louisiana statute providing for separate transportation accommodations. I refer to Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256, decided in 1896.

■ Since Plessy the Supreme Court has given a more literal and in my opinion a more just and equitable interpretation to the Equal Protection Clause contained in the 14th Amendment. That a state, or an individual, acting under color of state authority, cannot unreasonably discriminate against a race, religious or ethnic group, in the granting of job opportunities can no longer be questioned. Furthermore, the 5th Amendment's Due Process Clause, notwithstanding some argument and suggestions to the contrary by counsel in the instant case, has now unequivocally been determined by the Supreme Court to either by inference adopt literally or at the very least legally encompass the Equal Protection Clause of the 14th Amendment. I cite Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884. To hold otherwise would of necessity imply an anomalous circumstance which would in effect permit the Federal Government (which would in-

clude the District of Columbia) to violate rights made sacrosanct from similar invasions by the states. A most recent statement by the Supreme Court is most relevant not only legally but factually to the instant case. In Colorado Anti-Discrimination Commission v. Continental Air Lines, 372 U.S. 714, at page 721, 83 S.Ct. 1022, at page 1025, 10 L.Ed.2d 84 the Court stated:

"But under our more recent decisions [in addition to Bolling v. Sharpe the Court cited Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686 (1954); Bailey v. Patterson, 369 U.S. 31, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962)] any state or federal law [says the Supreme Court] requiring applicants for any job to be turned away because of their color would be invalid under the Due Process Clause of the Fifth Amendment and the Due Process and Equal Protection Clauses of the Fourteenth Amendment."

It might well be argued, and indeed it has been, that on the basis of the evidence before me neither the Federal Government, through its agency defendants, nor the State of Illinois, through the Board of Education, actively violated the constitutional rights of the plaintiffs. There is in my mind little question and I have so found it to be a fact, that the Union and the Joint Committee invidiously discriminated against the plaintiffs. However, I am not unmindful that the 5th and the 14th Amendment do not protect against merely private conduct. U. S. v. Harris, 106 U.S. 629, 1 S.Ct. 601, 27 L.Ed. 290 and U. S. v. Cruikshank, 92 U.S. 542, 23 L.Ed. 588.

This denial of "public body" action is not novel, and if in effect it is substantiated by the evidence, which in my opinion it was not in the instant case, it would state a defense to actions such as this. We must look to the relationship between the constitutional violator on the one hand and the government, be it federal or state, on the other. It should be remembered that public bodies may and of necessity do act through a variety of agencies.

■ The actions of these agencies are none the less the actions of their creators. And that the actions of all such agencies, be they legislative, executive or judicial, are attributable to the public body and can be the cause of constitutional violations cannot be questioned. State of Virginia v. Rives, 100 U.S. 313, 25 L.Ed. 667, Brinkerhoff-Faris Trust & Savings Co. v. Hill, 281 U.S. 673, 50 S.Ct. 451, 74 L.Ed. 1107.

The discrimination in the instant case could not have been accomplished without the aid and assistance of the three public agencies defendants. The character of the actions and conduct of these defendant agencies cannot be attenuated by the woefully repetitious argument that they did not directly and solely discriminate against the plaintiffs. It is obvious from the evidence that their actions are wholly inconsistent with the constitutional guarantees they are required to honor. I now legally conclude from the instant facts it is not only clearly established that such a relationship exists but in the language of the Supreme Court a relationship involving the Federal Government and the State, through their respective agencies, to a "significant extent". Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45.

These various relationships deserve comment. Although both government agencies, GSA and the Bureau, are related significantly to the discriminatory practices, their attitudes and reaction to the instant situation were not necessarily similar. On the one hand GSA through the defendant Tesauro acknowledged the existence of this undesirable situation, one which by continued erection of the Federal Courthouse structure it was unwillingly fostering and becoming an integral part of. The evidence clearly shows that Tesauro earnestly attempted to adopt and foster and eventually make a reality the policies of the President of the United States set forth in his Executive Order No. 10925 on Equal Employ-

ment Opportunities, which was made a part of the contracts in the instant case. The tools which he, Tesauro, was given to accomplish this task proved glaringly insufficient. In this regard the evidence shows his having notified the President's Committee on Equal Employment of the discriminatory practices. At best his remedial power extended only to the contractor and sub-contractors and then only to a very limited degree. Needless to say he could not require them, or more specifically in this instance Bethlehem Steel, to hire non-union help. Such a suggestion would require Bethlehem to breach their collective bargaining contract with the Union. His suggestions, recommendations and indeed his accomplishments, blemished only by this Union and Joint Committee, constituted a realistic effort to compensate for past and to avoid future charges and incidents of discrimination. Action such as this by responsible government officials could do much to avoid many of the incidents reported all too frequently in the press these days. The defendant Union and the Joint Committee on the other hand have done much to stultify his work. All other unions and apprenticeship committees on this project have fully and unreservedly cooperated with Mr. Tesauro. The halls of justice which they are now helping to build will serve as a constant reminder to others that our Constitutional expressions of equality are more than mere abstract terms. The defendant Union and Joint Committee by their actions have in my opinion attempted to make a mockery out of the public spirit of these other unions who yielded to the efforts of Tesauro and others like him. Notably, this is the only Union and Joint Committee not to adhere to the policies set out in the Presidential Executive Order. They deliberately disobeyed the Presidential Order. True, the law imposes no criminal penalty or sanction for such action. However, sitting as a court of Equity I cannot help but note and disapprove the smug policy of this one Union of accepting the sweet and avoiding the bitter. In accepting work on this contract, they together with all other employees, accepted the benefits to be derived therefrom, however, they alone refused to comply with what they thought to be the repugnant part of the Presidential Order.

Basic Equity and simple justice to the unions which have so laudably cooperated compels mandatory action against this Union which has so selfishly and stubbornly refused even nominal or token cooperation.

My comments and observations on the activities and conduct of the defendant Tesauro are offered also to distinguish him and his agency's actions from those of the other Federal government agency defendant, as well as the nature and the background of some of the actions of the Union and its Joint Committee.

I have by the last few paragraphs intended to some extent to praise defendant Tesauro and the GSA. Unfortunately, I cannot say the same for the defendant Dost, who in my opinion sat idly by and through his course of non-action fed and encouraged the discriminators. With the obvious exception of The Department of Labor officers Cicero and Harris, who by their actions deserve praise similar to that bestowed on Tesauro, the evidence before me indicates at best disconcern by the Bureau as to this situation and situations similar to it. The Bureau was also the recipient of equally non-discriminatory platitudes from no less a personage than the Secretary of Labor. However, the Bureau files, that is, those which they could locate, and the testimony of Dost indicate an overall apathy to the problem, in my opinion. Ironically enough the remedial tools at its hands were and are far superior to those available to Tesauro. Could not the Joint Committee's recognition have been retracted, by the Bureau? Could not further assistance to the Joint Committee and the Union have been denied, by the Bureau?

In any event and notwithstanding what appears to me to be different motives and reaction to the situation, I must and do find from the evidence that both Federal

agencies directly and significantly made possible and aided in the perpetuation of the Joint Committee and Unions' discriminatory policies. The GSA by making it possible for the Union and Joint Committee to function on the Government Building project, the violent alternative of course, unfortunately would be to stop construction; and the Bureau by extending direct aid and assistance and recognition and in effect giving its blessing to the practices of the Joint Committee.

So also the Chicago Board of Education, notwithstanding its motivations and actual desires, neither of which are manifest by the evidence in the instant case but which I certainly presume to be laudable and public spirited. Nevertheless, the defendant, the Board of Education, did make available its facilities, its equipment and its teachers (who additionally I should observe were selected with the aid of the Joint Committee) to the furtherance of what it knew or should have known was an invidiously discriminatory scheme.

The Board of Education acted under color of state authority and its actions were and are "involved to a significant extent" with the overall discriminatory plan. Although possibly not directly related from a point of legal significance, I cannot help but note the extent to which our Supreme Court has gone to protect the Constitutional guarantee of freedom of religion from school board action. In People of the State of Illinois ex rel. McCollum v. Board of Education of School District No. 71, Champaign County, Illinois, reported at 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649, the Court declared unconstitutional the use of school buildings and school time for the utilization of religious education. Analogizing the facts in McCollum with those in the instant case for the purpose of making equity evaluation one cannot help but note the preponderance of the equities in the case now before me. For here the utilization of a tax supported system is in aid of racial discrimination, not merely the teaching of religious tenets which are in and of themselves far from being morally wrong.

I reiterate, discriminatory practices of the Union and the Joint Committee absent the facts of public body consent, assistance or support would not of themselves violate the 5th or 14th Amendments. The privilege of membership in a labor union is of no concern in and of itself to the courts. Moreover, membership in a union in and of itself cannot properly be made a subject of concern of this court unless as we have here, it is an essential requirement and qualification to the plaintiffs realizing rights owed them by the Federal and State governments.

The Union and the Joint Committee are, on the basis of the facts here, an integral part of a Federal and State project. A private citizen or organization, to the extent that their activities remain entirely private and unrelated and non-dependant upon the sovereign, cannot be charged with denial of equal protection of the law. However, we have more. The Federal government through two of its agencies and the State through one of its agencies, is at the very least passively assisting, aiding and making it possible for the defendant Union and Joint Committee to realize and perpetuate their discriminatory practices. The defendant agencies in practice and in effect are permitting the Union and Joint Committee to practice racial discrimination and by so doing if not directly at least indirectly are denying plaintiffs their constitutional rights.

If I might extend and apply to the instant facts some of the language and reasoning of the Supreme Court I think it fair to state, that in the wording of Smith v. Allright 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987, being indentured into the Union is an "essential qualification" which must be met by one seeking employment as an iron worker on the Federal Courthouse Building. The landmark, Civil Rights Cases 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835, holding that the actions of individuals, as individuals, unsupported by governmental authority (the Court

was there concerned with State action) cannot constitute a violation of one's constitutional rights, used the following language: " * * * if not sanctioned in some way by the State, or done under State authority * * * ". I find on the evidence before me that the three governmental agency defendants have here sanctioned the conduct of the Union and the Joint Committee, within the language of that opinion.

It is clear on the basis of the evidence and the law of the case that the defendant Contractor, Paschen-Kiewit, has not been guilty of any act or acts of discriminatory conduct against either the named plaintiffs or for that matter any un-named members of the plaintiffs' class. Accordingly, I now award judgment to and dismiss the defendant Contractor.

It is equally clear on the basis of the evidence and the law of the case that the defendant Bethlehem has not been guilty of any act or acts of discriminatory conduct against either the named plaintiffs or for that matter any un-named members of the plaintiffs' class. However, for the purpose of and only for the purpose of rendering a complete and total decree I cannot dismiss but must retain jurisdiction over Bethelehem Steel.

In accordance with the views here expressed I must and do of necessity retain jurisdiction over the three public agency defendants, GSA, the Bureau and the Board of Education.

Accordingly, and as to the remaining defendants not heretofore dismissed, I find the issues for the plaintiffs and I hereby order adjudged and decreed that the defendants Joint Apprenticeship Committee of the Steel Workers of Chicago and International Association of Bridge Structural and Ornamental Iron Workers Local Union No. 1, Sidney I. Cole, Chairman, Frank D. Rieland, Treasurer, A. Walter Becker, Thomas Cannon, James Eads, Joseph Frankovic, Standford Jacobs and Edmund D. Flood, Apprentice Co-Ordinator, and each of them, their agents, servants, employees and attorneys and all persons in active concert and participation with them are hereby jointly and severally commanded forthwith to certify for indenture as apprentices the plaintiffs Ronald L. Todd and James Hill and to thereupon immediately tender them for employment as apprenticeship Ironworkers to Bethlehem Steel Company, and further, they are ordered hereinafter to cease and desist from continued and further discrimination against negro applicants and applications.

It is hereby further ordered, adjudged and decreed that the defendants International Association of Bridge Structural and Ornamental Iron Workers, Local Union No. 1, Steve Zakula, President, Frank Pauley, Secretary-Treasurer, Joseph Frankovic, Job Representative, and Edmund D. Flood, Apprentice Co-Ordinator, their agents, servants, employees and attorneys and all persons in active concert and participation with them are hereby individually and collectively, jointly and severally commanded forthwith to admit the said plaintiffs Ronald L. Todd and James Hill to membership in the said Union as apprentices and they and each of them are hereby further restrained from interfering in any way directly or indirectly with the full and peaceful enjoyment by the said plaintiffs of all of the rights, privileges and profits lawfully appertaining to such membership, and further, they are hereinafter ordered to cease and desist from continued and further discrimination against negro applicants for membership.

It is hereby further ordered, adjudged and decreed that the defendant Bethlehem Steel Company employ as Apprentice Iron Workers the said Todd and Hill upon their certification and admission as aforesaid.

It is hereby further ordered that the costs of this proceeding be taxed against the Joint Apprenticeship Committee and Iron Workers Bridge and Structural Union, Local No. 1.

Counsel for plaintiffs is hereby directed to prepare and submit to the court

within five days hereof, detailed Findings of Fact, Conclusions of Law and a formal Decree of Preliminary Injunction in conformity with the views here expressed.

Judgment accordingly.